UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GET BACK UP, INC.,

      Plaintiff,

                                    Case No.
vs.                              Hon.

CITY OF DETROIT,
CITY OF DETROIT BOARD OF ZONING APPEALS,

      Defendants.

_____/

MADDIN, HAUSER, ROTH & HELLER, P.C.
By: Jonathan B. Frank (P42656)
Of Counsel
Attorney for Plaintiff
28400 Northwestern Hwy, Suite 200
Southfield, Michigan 48034
(248) 354-4030

_____/

## COMPLAINT AND JURY DEMAND

1. Plaintiff Get Back Up, Inc. ("Get Back Up") operated and seeks to continue to operate a residential substance abuse treatment facility in the City of Detroit, previously serving approximately 40 residents. In addition to substance abuse treatment, it offers adult education that includes G.E.D. instruction and job training that includes federally-sponsored apprenticeship programs.

2. The City's professional staff responsible for planning and ordinance enforcement approved this use.

3. Neighbors opposed this use in a blatantly "not in my backyard" response to the presence of recovering alcoholics and addicts.

4. In March, 2016, the City's Board of Zoning Appeals bowed to political pressure and rejected Get Back Up's City-supported zoning application.

5.   The Wayne County Circuit Court just denied Get Back Up's appeal on January 6, 2017 on the basis that there was sufficient evidence in the record to meet the statutory test for a zoning decision.   The Court specifically noted that it did not agree or disagree with the actual decision.  The Court was not asked to and did not opine on the federal questions raised now.

6.   This complaint seeks a declaration that the City's enforcement of a zoning ordinance based on impermissible stereotypes about recovering alcoholics and addicts violates the Fair Housing Act, the Rehabilitation Act, and the Americans with Disabilities Act, as well as a request for damages and attorney fees.

7.   Get Back Up agrees with this conclusion reached by U.S. District Court Judge Robert Cleland in an earlier case (to be discussed in more detail below):

> The record contains letters from Get Back Up residents, and their relatives, describing how Get Back Up has served them.  These solemn documents affirm that Get Back Up helps men to stay sober, to think positively, to set goals, to become accountable – to "turn their lives around."  Get Back Up does noble work.  Addicts and their families lose if it closes.  Detroit loses.

### Jurisdiction and Venue

8.   The Court has jurisdiction under 28 U.S.C. §1331, 42 U.S.C. §3613(a)(1)(A), 29 USC § 794, and 42 U.S.C. §12131 et seq.

9.   Venue is proper under 28 U.S.C. §1391(b).

### History of Get Back Up

10. Get Back Up, a non-profit organization, owns a residential substance abuse service facility in the City of Detroit, previously serving approximately 40 residents.

11. Get Back Up is fully licensed by the State of Michigan Department of Community Health, which has a specific license for and regulations governing substance abuse programs. MCL 333.6233.

2

12. More information about Get Back Up is found at www.btgetbackup.com.

13. Get Back Up is the vision of its founder, President and CEO, Dr. William L. (Billy) Taylor, Jr., and is based on the belief that having a positive vision of the future is a powerful motivator for change.  Dr. Taylor has inspired thousands to turn life's setbacks into comebacks and "Get Back Up" – he is a former All-American football player at the University of Michigan and also a recovering alcoholic who spent time living on the streets of Detroit before turning his life around, getting a PhD, and starting Get Back Up.  His biography can be found at http://www.btgetbackup.com/index.php/about_us/about_dr_billy_taylor.

14. Get Back Up's programs draw upon the personal achievements and life experiences of Dr. Taylor and focus on several core areas:

a. **Transitional Dynamics:** Dealing with individual and collective behaviors, environmental influences, personal actions and attitudes that shape clients' experiences as they navigate the rigorous road of recovery.

b. **Academic Success:** Get Back Up stresses that academic success can provide clients with skills, knowledge and self-esteem that no one can ever take away.

c. **Second Starts:**  Because of his personal experience, Dr. Taylor is committed to building new services and working with existing programs that bolster the opportunities for and success of people who are striving for second starts.

d. **Motivation:** Having a positive vision of the future is a powerful motivator for change.   Get Back Up focuses on the "five P's": **P**reparation, **P**ersistence, **P**atience, **P**erseverance and the **P**ower of Transformation.

3

  e. **Life Coaching:** Get Back Up consistently uses two "headline" phrases that relate to the Life Coaching Process: "Plan your Life's Work, and Work your Life's Plan" and "When Plan A Fails, Implement Plan B".

15. Get Back Up had contracts to serve adult males who are homeless, unemployed, uninsured and underinsured and/or mandated to enter the program by a court.

16. In addition to substance abuse treatment, Get Back Up offers adult education that includes G.E.D. instruction and job training that includes federally-sponsored apprenticeship programs.

### *Get Back Up Obtains a Conditional Use Permit*

17. Get Back Up purchased its facility from the Detroit Public School District for roughly $500,000 on August 2, 2007.

18. Get Back Up invested approximately $3,000,000 in the facility.  The primary expense was rehabilitating the facility, which was an abandoned Detroit school.

19. The facility is on a major street, Dexter, adjacent to the residential neighborhood. The address is 12305 Dexter, between Cortland and Sturtevant, about one-third of a mile south of Davison.

20. This location makes the facility easily accessible to clients.

21. The address is zoned B-4.

22. The City's Zoning Ordinance defines a "substance abuse service facility" as "An establishment used for the treatment of persons having drug or alcohol abuse problems on an outpatient basis. The establishment may or may not dispense compounds or prescription medicines to individuals depending upon the severity of their drug or alcohol abuse problems. A

generally recognized pharmacy or licensed hospital dispensing prescription medicines shall not be considered a substance abuse service facility."

23.     Certain uses are permitted in this B4 district "by-right.". Secs. 61-9-73 through 78. Among the "by-right" uses are boarding schools (74(1)), convalescent, nursing or rest homes (74(3)), domestic violence shelters (74(6)), hospitals (75(8)), neighborhood centers non-profit (75(11)), outdoor recreational facility (75(12)), schools (75(14)), business colleges and commercial trade schools (76(8)), medical clinics (76(16)), and private clubs (76(25)).

24.     Neighbors in the area are therefore on notice that these uses might be nearby. These uses might be loud, crowded, and traffic-intense.  Nonetheless, the City permits them "by right."

25.     Other uses are deemed "conditional uses."  Secs. 61-3-201 et seq.; 61-9-79 et seq. Two such "conditional uses" are residential and non-residential "substance abuse service facilities."  Secs. 61-9-80(6), 61-9-81(5).

26.     To operate one of these "conditional uses," the owner must obtain a Conditional Use Permit, which entails review by a City department, public hearings, site plan review and review by the City's Board of Zoning Appeals.  Secs. 61-3-203, 214, 216, 242, 243, 244, 245.

27.     Get Back Up applied for a Conditional Use Permit.

28.     There was a public hearing before the City's Building & Safety Engineering Department ("B&SE", as it was then called) on November 7, 2007.

29.     On December 12, 2007, the City's Planning and Development Department ("PDD") initially recommended that B&SE deny the application.

30.     However, B&SE conditionally approved the application on December 21, 2007, responding to PDD's concerns.

5

31.     PDD then reversed itself, approving Get Back Up's site plan and use on January 9, 2008.

*First BZA Appeal*

32.     The Russell Woods Sullivan Area Association (the "Association"), the local homeowners' association, filed an appeal to the BZA on January 18, 2008.

33.     The BZA conducted an appeal hearing on February 19, 2008.

34.     The BZA reversed the decision of the B&SE by a vote of 5-2, with the Chair and Vice-Chair supporting Get Back Up.

*The Earlier Wayne County Circuit Court Action*

35.     Get Back Up filed an appeal in Wayne County Circuit Court.

36.     On the day of oral argument of the appeal, August 15, 2008, Get Back Up and the BZA entered into a Consent Judgment that reflected a compromise position – reducing the number of beds in the facility and dismissing Get Back Up's claim for damages.

37.     Based in part on the Consent Judgment, Get Back Up obtained its accreditation and remodeled its facility at substantial expense, obtaining all necessary permits and a Certificate of Occupancy in early 2009.

38.     In the meantime, the Association was allowed to intervene and file a motion to set aside the Consent Judgment, which the circuit court denied.  The Association did not set its Motion to Intervene for hearing until October 10, 2008.

39.     Although the circuit court refused to set aside the Consent Judgment, it incongruously remanded the case to the BZA.  Thus, the public had a second opportunity to object to Get Back Up's facility.

*Get Back Up Opens the Facility*

6

40.     Get Back Up officially welcomed its first residents in April, 2009; there were 29 residents by December and there were 40 as of May, 2012.  These residents received three meals a day and continuous programming that included relapse prevention, anger management, domestic violence counseling, and job training.

41.     Get Back Up and the City agreed to a series of orders permitting Get Back Up to operate during the pending litigation.  As will be discussed below, this allowed Get Back Up to operate until August, 2015.

42.     Significantly, this created a track record regarding the benefits of Get Back Up's operation, as well as the absence of any injury to the neighboring community.

43.     Get Back Up's staff numbered 18 and included a Director of Operations, a Director of Rehabilitation Services, three counselors/care managers, nine security monitors, two administrative assistants, and two chefs.

44.     Get Back Up provided a wide range of indispensable services to counter the large and growing drug problem in the City.  Significantly, many of the Get Back Up residents chose to participate, indicating a strong desire to improve their lives.  Others participated as a condition of incarceration and/or probation through Get Back Up's prior contract with the Michigan Department of Corrections.

45.     All of these services were consistent with the Next Detroit Neighborhood Initiative (focusing on three key areas: serious crime prevention, major land use/reuse, and prevention of illegal dumping) and the City's Master Plan.

46.     Get Back Up, through its programming, community-building and resident leadership, attempted to create an environment where crime is suppressed and the quality of life enhanced.

7

***Subsequent Activity in the Wayne County Circuit Court Action***

47.     Even though Get Back Up had successfully opened the facility, the Association again filed a motion to set aside the Consent Judgment.

48.     On April 20, 2009, the circuit court granted the Association's motion, setting aside the Consent Judgment eight months after it had been entered and after Get Back Up had spent considerable money and time in reliance on the Consent Judgment, obtaining all necessary permits and a Certificate of Occupancy.

49.     The circuit court again remanded the case to the BZA, which conducted a hearing on December 8, 2009 and issued a decision on March 10, 2010 reversing the B&SE's grant of the Conditional Use Permit.

***The BZA's Findings***

50.     Get Back Up established that there had not been any increase in criminal activity. Dr. Taylor explained to the BZA that in the nine months of operation between April and December, 2009, there were no criminal incidents. Dr. Taylor was present every day. There are 16 security cameras within and outside the facility and security staff monitors every door. Bed checks were done every night. Residents were not allowed to have cars. To ensure safety in the surrounding area, new residents must complete 60 days of programming before they earn a day pass to leave the facility or have visitors (these visitors must be on a pre-determined list); all visitors must pass through metal detectors.[1]

---

[1] The 60-day requirement was later reduced to 30 days.

51.     Get Back Up also provides the surrounding area with the direct benefit of heightened security.  Local businesses support Get Back Up.  In one specific case, Get Back Up's security foiled an attempted break-in at the neighboring Grace Temple Church of God in Christ.  Get Back Up's security staff also discouraged break-ins in the neighborhood.  Pastor Franklin Garrison submitted three additional letters explaining the value of Get Back Up's presence in maintaining a secure and inviting neighborhood and praising Dr. Taylor's courage for investing in a program that will "make a positive change…"  Get Back Up continued to work closely with the church, to the point of providing food and school supplies.

52.     In the absence of criminal activity, residents complained to the BZA about their general fears of having addicts in the neighborhood and inappropriate conduct such as residents making gestures from their windows.  Of critical importance, there was no evidence that these fears became reality or that the neighbors brought these minor incidents to Get Back Up's attention.  Nor was there any evidence that the conduct continued after residents complained to the BZA.

53.     Get Back Up established that its facility had a positive effect on property values, as the report provided to the BZA established.

54.     The Association had no proof to the contrary.  The Association's only witness, a realtor in the area, offered hearsay testimony about someone who decided to buy a house two blocks away from the Get Back Up facility instead of closer.  This witness did not actually know the reason for the buyer's decision, and the BZA chair expressed his confusion about the value of her testimony.  This witness also testified to another situation but could not provide any helpful details.  Finally, this witness conceded that any reduction in values was due to the market, not to Get Back Up.

55.     Despite this record, the BZA rejected Get Back Up's application for a Conditional Use Permit.

### Subsequent Litigation

56.     Get Back Up took an administrative appeal, which was denied.

57.     Get Back Up also challenged the City's ordinance as violative of federal law.  The City responded that the ordinance properly distinguished residential substance abuse service facilities for safety reasons.  When Get Back Up argued that this rationale also violated federal law, Judge Cleland upheld the ordinance on a different ground: that the ordinance was not facially invalid because the City could group Get Back Up's facility with rooming houses.  On appeal, when Get Back Up argued that this rationale was incorrect, the Court of Appeals upheld the ordinance on a different ground, never before asserted by the City or the lower court, that Get Back Up's facility was like a multi-family dwelling.  The federal case ended.

58.     Judge Cleland rejected an "as applied" challenge but the facts of the current case are fundamentally different.   At the time Judge Cleland ruled, the record did not include evidence of years of successful and trouble-free operation, nor were the neighbors' complaints at the earlier BZA hearing as obviously stereotypical as they were at the most recent BZA hearing.

59.     Incredibly, one neighbor actually complained about "looking at those-with the individuals coming in and out of those locations."

### Subsequent History of Operation

60.     The operation of the facility through August, 2015 is important because it undermines all of the concerns and suspicions raised by the neighbors, which were unfortunately based on impermissible stereotypes about recovering alcoholics and addicts.

61.     The property has been maintained as well as or better than other buildings in the neighborhood, at an expense of over $200,000 in the last several years.

62.     There have been no reports of criminal activity at the facility.

63.     There is no evidence that the facility has caused a decline in property values.  To the contrary, any decline in values correlated with the overall decline in Detroit.  This has now been reversed.  The homes in Russell Woods continue to sell at a premium over other homes in the City.

64.     There have been no complaints from the neighbors.

65.     Get Back Up successfully provided public health services *through a City of Detroit grant*.

66.     Get Back Up received additional letters of support, including letters from recipients of treatment, neighbors, public safety officials, corrections officials, industry members, and others.

67.     Minor building code violations have been corrected.

***Recent City Approval***

68.     The City ordered that Get Back Up cease operations after the conclusion of the federal court case.

69.     Based on its successful history through August, 2015, Get Back Up submitted a renewed application for a Conditional Use Permit to the City's Buildings, Safety Engineering and Environmental Department ("BSEED").

70.     BSEED held a hearing on September 30, 2015.

71.     The City's Planning & Development Department *approved Get Back Up's* request on October 21, 2015.

11

72.     The City's BSEED *approved the Conditional Use Permit* "with conditions," effective on November 6, 2015.  Exhibit A.

73.     *The BSEED found that Get Back Up had satisfied every criteria in the ordinance.*  Sec. 61-3-231.

74.     The "conditions" were to ensure that Get Back's Up facility complied with all statutes and ordinances and did not create a nuisance in the area.  Specific conditions included: exterior maintenance; fencing; security; and cleanliness.

*A Neighbor Appeals*

75.     One neighbor appealed.  Exhibit B.  There were three specific grounds for the appeal, relying on three specific criteria: 61-3-231(1), (3) and (8).

76.     On February 9, 2016, the BZA conducted a hearing.  The agenda is Exhibit C.  There were 5 members present.

77.     Get Back Up presented testimony and documentary support.  Exhibit D.

78.     Of primary significance, Get Back Up was able to point to over six years of successful operation during the time the City agreed not to enforce the Ordinance.

79.     Here is a detailed review of the supporting testimony, with references to the transcript:

    a.  Dr. Taylor described the history of his multi-million dollar investment in the property. (74-77). He bought an abandoned school building and completely restored it. He has maintained it ever since. He described the security measures he has put into place. (107-108). There have not been any problems with the physical structure or its use.

12

b.  Get Back Up introduced evidence of the excellent condition of its facility compared to other facilities in the area. (47). Responding to the specific part of the appeal based on the size of the facility, Get Back Up explained that the size was limited because of constraints on parking, staffing, and the facility itself. (47-48).

c.  Get Back Up presented evidence of the valuable public health benefit and outreach to the community. (46).

d.  Get Back Up introduced evidence of the property values showing that there was no decline associated with Get Back Up. (48). Exhibits G and H to the BZA hearing. Any negative impact was coming from the blight up and down Dexter, not from Get Back Up. (63).

e.  Get Back Up explained that the zoning in this area permits a wide variety of uses "by right" which may produce significant noise and traffic, such as a school, outdoor recreation center, hospital, and nursing home. (54-55, 93-94). Get Back Up would actually create smaller burdens on the area.

f.  In response to the unsupported allegation that residents of the facility are outside loitering, Dr. Taylor explained the history of the facility and the fact that residents did not cause any trouble in the neighborhood. (56-57). Not once has a neighbor ever complained to him. Nor have the police issued him any citations or even warnings. (76, 164). Indeed, when a member of the BZA asked Ms. Lewis (a witness opposing Get Back Up's use) if any neighbor had ever reported problems, she could not give an affirmative answer. (58-59). Then, in a candid moment, Mr. Jennings

13

(President of the homeowners' association) conceded that the only time someone complained about a problem (years ago, when men in the facility were seen standing at an upstairs window looking down at the street), Dr. Taylor fixed the problem immediately. (59-60).

g.  Get Back Up introduced evidence specific to the ordinance regarding properties on the same side of the street. (84-85). Exhibit I to the BZA hearing. Unlike the well-maintained structure owned by Get Back Up, most of the other buildings are abandoned and falling apart. There was no evidence that other businesses would be deterred from coming into the area. (72). To the contrary, the only evidence was that some businesses have come into the area recently.

h.  The facility is consistent with the intent and purpose of the Ordinance because it is located in a district that permits uses that benefit public health, such as convalescent homes, nursing homes, hospitals, rest homes, and other medical facilities. (112-113). It has all the necessary licensing and certification. (113-114).

i.  The petitioner's representative stipulated that the project is consistent with the City Master Plan. (65-66). Get Back Up obviously agreed. (68-69).

j.  Edward Lowe, from the City's Planning and Development Department, explained why Get Back Up had received preliminary approval and why the City had imposed certain conditions on the development. (23-29).

14

k. Lawrence Mohammad from the BSEED also explained the reasons for approval. (38-41). He noted a concern about parking, but that had been resolved.

l. All the evidence from witnesses associated with law enforcement favored Get Back Up. The letters were submitted as Exhibit A to the BZA hearing. Notably, no law enforcement representative testified or presented any documentary evidence *against* Get Back Up.

m. Pastor Franklin Garrison, Pastor of the Grace Temple next door to Get Back Up, testified to the good work being done by Dr. Taylor and his facility. (135-136). He also submitted a letter, as did two other officers of the church and five residents of the neighborhood who were also members of the church.

n. Ms. Kiamba Jones, an employee of Get Back Up, explained how she takes care of any trash problems that arise. (136-137). She also explained that, as the only female in the building, she feels secure. (138).

o. Mr. Marshall is a former resident of Get Back Up who now works there. He explained his personal story of recovery. (138-141). He also testified to his interaction with residents in the neighborhood – he has been called upon to do work at houses in the neighborhood.

p. Mr. Holmes also testified about his experience as a "returning citizen" and employee of Get Back Up. (141-143).

q. Mr. Warshay, executive director of Community and Home Support, testified in support of Get Back Up and submitted a letter. (143-146).

r.  Mr. McGhee, a former undercover police officer with experience combatting drugs, testified in support. (151-154). Putting the fears and stereotypes in perspective, he eloquently explained that addicts are in every neighborhood, that education and treatment are necessary, and that in all his years as a police officer, "we never conducted an undercover operation at a substance abuse clinic nor did we ever conduct a raid at one." (154).

s.  Ms. Wilson, a corrections officer and social worker, testified in support and submitted a letter. (146-148).

t.  Additional letters of support came from the President/CEO of KPEP (the Kalamazoo Probation Enhancement Program), a parole agent with the Michigan Department of Corrections, and the owner of a nearby market.

80.  Various neighbors raised concerns, again based on the stereotype of a recovering alcoholic or addict.

a.  The petitioner Jeannette Abbott did not testify. In her place, a resident named Gwen Lewis who is also a local realtor testified. Ms. Lewis was quite candid: the very first argument she made had to do with disrespect. (20). Apparently, the neighbors are still upset about the fact that Dr. Taylor did not comprehensively interact with them when he purchased the facility in 2007. Dr. Taylor regrets that he has left the impression that he has disrespected any member of the community. That was certainly not his intention. But regardless, disrespect is an insufficient basis to deny a Conditional Use Permit.

16

b. Ms. Lewis referred to a survey related to the values of residential property in the area of a substance-abuse facility. (19). This survey – limited to data in central Virginia – had nothing to do with Detroit, nothing to do with this particular neighborhood, and nothing to do with this particular applicant. Ms. Lewis conceded that she did not have any empirical evidence of a decline in property values. (61-62). Further, empirical data from the time that Get Back Up has been in operation disproves the conclusions of the survey. Finally, the survey itself recognizes that there may be "very little" that residents can do because those receiving treatment are protected as disabled under federal law.

c. Ms. Lewis then questioned whether the facility contained enough space to provide treatment. (21). This, however, is well beyond her expertise as a real estate broker. Dr. Taylor, who has received licensing and certification, was confident that he could provide services in the available space. Ms. Lewis did confirm that the facility is in excellent condition. (62).

d. Ms. Lewis also questioned parking arrangements. However, the BSEED had fully analyzed this issue and addressed it in the approval letter.

e. Ms. Lewis noted that trash had recently been seen around the building. (23). There was no indication that Get Back Up was responsible for the trash. Further, Dr. Taylor and Ms. Jones explained that Get Back Up immediately cleaned up any trash in the area. (81, 97). Get Back Up can hardly be faulted for the uncleanliness of some of the neighbors.

1956895/15878.0001

f.  Ms. Lewis also complained about the alley not being closed. (83, 86). But as Dr. Taylor explained, the City required that the alley stay open. (97-98).

g.  Errol Jennings, the President of the homeowners' association, also testified. However, he did not provide any factual information that would have supported the BZA decision. To the contrary, he substantiated the point that property values in the area were not declining, even though Get Back Up had been in the neighborhood for eight years. (45). Though Mr. Jennings expressed a concern that this might change, such a concern is hardly evidence that the facility would cause a decline in property values. Moreover, this concern can be tied directly to impermissible fears and stereotypes about recovering alcoholics and addicts.

h.  Mr. Jennings also expressed a concern about the type of development in the area, noting the recent opening of two motorcycle clubs, one dispensary, and a party store. (51). But of course these other uses are unrelated to the present appeal. The fact is that those uses complied with the zoning in the area and were the best available use of the space. Moreover, any new development is arguably better than the blight that dominates the neighborhood.

i.  Other neighbors opposing Get Back Up made various inaccurate statements. One neighbor complained that the Get Back Up had been operating in violation of a court order. (116). That is inaccurate because the court order, *agreed to by the City*, placed a stay of enforcement in effect during the litigation. It was only after the litigation ended that the

18

City moved to enforce the Ordinance. At that time, Get Back Up complied and closed its operations pending the outcome of this appeal.  Get Back Up never violated a court order.

j.  That same neighbor complained that Get Back Up's residents could come and go at will. (117). That is inaccurate because there are severe restrictions on movement. Residents are not allowed to leave without supervision and permission. Regardless, this neighbor was advancing exactly those fears and stereotypes that are not permitted by federal law. There is no evidence that any recovering alcoholic or addict is any more dangerous than a resident living in a house, apartment, or any other residential facility.

k.  That same neighbor complained about a man who had hidden on the floor of her car. (119). She "testified" to secondhand information about this man walking "around the back of Get Back Up." There was no indication that the man was a resident of Get Back Up.

l.  Another neighbor complained about "sexual innuendos" coming from the facility. (120). Nobody has ever complained to Dr. Taylor about that; he explained that the men are "monitored closely." (164). The only complaint he had received, years ago, involved residents looking through an upstairs window. When he received that complaint, he reacted immediately. Notably, BSEED included in its conditions a requirement that there be no nuisances created. Once a Conditional Use Permit is in place, neighbors

would therefore have the ability to complain if they felt that residents were harassing them.

m. That same neighbor testified that he has seen people throw things in and out of windows of the facility. (120). Again, nobody has complained to Dr. Taylor about that. Certainly he has every motivation to control behavior that is inconsistent with his treatment. In any event, there is no evidence that these actions had any impact on the community.

n. Another neighbor complained about "hundreds and hundreds and hundreds and hundreds of drug addicts and possibly felons." (124). Once again, this demonstrates the common fallacy about recovering addicts and alcoholics. There is no evidence that, while they are in a treatment facility, residents are any more or less dangerous than any member of the public. Any perception to the contrary is an impermissible fear and stereotype.

o. One neighbor noted that if he had known that Get Back Up was operating he may not have bought a house in the neighborhood. (130). But Get Back Up actually was operating. The neighbor did not know it because there would be no outward signs to generate any concern. In any event, this neighbor was apparently not dissuaded by the blocks and blocks of abandoned buildings, liquor stores, drug houses, and "weed houses" that a different neighbor testified to. (125). It is hard to imagine that he would have been dissuaded by a fully functioning rehab center. If he was, his concern would be based on impermissible fears and stereotypes, not on facts.

20

p. Another neighbor complained about "looking at those-with the individuals coming in and out of those locations." (131). That is exactly the kind of fear and stereotype that makes this such a problematic issue.

81. At the conclusion of the hearing, Member Weed moved to vote to reverse the BSEED. The motion was seconded.

82. The vote was 4-1 in favor of the motion. Member Huxley voted against. Exhibit E.

83. On February 12, 2016, Member Thomas asked to reconsider his vote.

84. At the February 23, 2016 meeting, Member Thomas was absent, so no action was taken on his request to reconsider.

85. Nonetheless, the BZA approved the minutes of the February 9 meeting at the February 23 meeting. Exhibit F.

86. At the March 8, 2016 meeting, Member Thomas made a motion to reconsider. Member Huxley was absent. There was no second for the motion.

87. On March 8, 2016, the BZA entered a Decision and Order. Exhibit G. The BZA simply repeated certain criteria in the Ordinance, even where there was no evidence to support the BZA and even where the appeal did not even challenge the criteria.

88. In doing so, the BZA impermissibly relied, for obvious political reasons, on the stereotypes expressed by the neighbors. Indeed, fourteen of the residents noted, in their identical letters to the BZA which did not contain a single substantive objection, that their neighborhood had "one of the best voting records in the city of Detroit."

89. The discrimination of the neighbors was clear. An analogy to discrimination against minorities is useful: the neighbors could not legally argue against a use because they

21

were afraid that having minorities in the area might "damage their property values," or because they perceived these minorities to be "more likely to be criminals." Yet that is exactly the language used by members of the community who came out to speak against Get Back Up.

90.     The BZA conducted no real analysis. Instead, the members read scripted questions which did nothing more than parrot the language of the ordinance.

91.     The BZA found that the proposed Residential Substance Abuse Rehabilitation Treatment Clinic would not be compatible with the adjacent residential community and would be an intrusion to the adjacent properties because this use would have an adverse effect on the community relative to health and safety. But there was no evidence to support a finding regarding a negative impact on health or safety. To the contrary, there was evidence that a substance abuse service facility has a positive impact on health and safety, both in the proximate community and in the City overall.

92.     The BZA also found that the proposed Residential Substance Abuse Rehabilitation Treatment Clinic would impede the social and economic development of the adjacent and surrounding property and residential community, and would be harmful to the area. But there was no evidence to support this finding. Moreover, this issue was not even part of the appeal.

93.     The BZA further found that to permit the proposed Residential Substance Abuse Rehabilitation Treatment Clinic will result in practical difficulty or unnecessary hardship to the community and would deprive the area residents of reasonable use of their land because the proposed use would be virtually in the communities backyard. But there was no evidence to support this finding. Moreover, this issue was not even part of the appeal. Finally, as stated, the ruling does not match any of the criteria in the Ordinance.

94.     The BZA further found that the BZA petitioner did present substantial evidence that the proposed Residential Substance Abuse Rehabilitation Treatment Clinic would have a negative effect on the residential properties.  But there was no evidence to support this finding, just unsubstantiated speculation.  The only empirical evidence supported the contrary conclusion: that Get Back Up has no impact on property values.  And any fear of a decline in property values based on the proximity to recovering alcoholics and addicts should not have been considered.

95.     The BZA further found that to allow the proposed Residential Substance Abuse Rehabilitation Treatment Clinic would substantially affect the neighboring properties by detracting from the aesthetic value of the surrounding properties that is historic.  But there was no evidence to support this finding.  To the contrary, Get Back Up's facility is one of the best maintained facilities on the block.

96.     The BZA further found that to permit the proposed Residential Substance Abuse Rehabilitation Treatment Clinic would be injurious and detrimental to the community because it would aggravate pre-existing conditions in the area and impede orderly development in the community.  But there was no evidence to support this finding.  The pre-existing conditions include blight.  Get Back Up reversed that condition.  Nobody testified that development would suffer because of Get Back Up's use.

97.     The BZA further found that the proposed Residential Substance Abuse Rehabilitation Treatment Clinic would have a detrimental effect on neighboring properties in the area and alter the character of the residential area.  But there was no evidence to support this finding.  The location is on a major street and the proposed use is similar to other uses permitted "by right" at that location, even though they would border a neighborhood.

98.     The BZA concluded that to permit the proposed Residential Substance Abuse Rehabilitation Treatment Clinic would not be in keeping with the spirit and purpose of the Zoning Ordinance for all of the above reasons.

99.     There was no valid evidence to support the BZA's decision.  Instead, the decision was based on neighbors' unfounded concerns about the conduct of recovering alcoholics and addicts, which federal law specifically rejects.

100.    Get Back Up established support for every one of the criteria listed in the zoning ordinance.  Sec. 61-3-231.

101.    It was based on this support that the City's professional staff conditionally *approved* Get Back Up's application for a Conditional Use Permit.

102.    Get Back Up took an administrative appeal within the Michigan state court system under MCL 125.3606.

103.    The Wayne County Circuit Court denied the appeal on January 6, 2017.

104.    Get Back Up has exhausted its state court remedies.

## COUNT ONE – VIOLATION OF ADA, REHABILITATION ACT, FHA

105.    Get Back Up incorporates the preceding paragraphs.

106.    The City's ordinances, as applied in this case, violate the Americans with Disabilities Act, 42 USC § 12101, et seq., ("ADA"), Rehabilitation Act of 1973, 29 USC § 794 (the "Rehabilitation Act"), and the Fair Housing Act, 42 USC §§ 3601-31 ("FHA"), because the BZA decision was impermissibly based upon myths, fears, and stereotypes concerning individuals suffering from alcohol and/or drug dependency in violation of the ADA, Rehabilitation Act, and FHA.

24

107. Get Back Up has standing to assert violations of the ADA, Rehabilitation Act, and FHA.

108. Individuals are considered disabled under the ADA, Rehabilitation Act, and FHA if they are recovering from substance abuse problems.

109. The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 USC § 3604(f)(1).   The statute defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

110. The ADA and the Rehabilitation Act also prohibit all discrimination based on disability by public entities.

111. Specifically, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 USC § 12132; and the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 USC § 794(a).

112. The ADA, Rehabilitation Act, and FHA allow for injunctive relief.

113. Get Back Up and its clientele will be irreparably harmed if Get Back Up is not allowed to provide residential substance abuse treatment.

1956895/15878.0001

114.  Get Back Up has suffered damages through lost income, in addition to attorney fees and costs.

WHEREFORE, Get Back Up requests:

1.  An order enjoining the City from enforcing the Ordinance and vacating the decision of the Board of Zoning Appeals;

2.  An order granting a Conditional Use Permit to Get Back Up on the terms approved by the City;

3.  An award of damages, attorney fees and costs;

4.  Such other relief as is appropriate.

## JURY DEMAND

Plaintiff demands a jury trial of all issues.

Respectfully submitted,

MADDIN, HAUSER, ROTH & HELLER, P.C.

By:___*/s/ Jonathan B. Frank*_____
   Jonathan B. Frank (P42656)
Attorney for Plaintiff

Dated:  January 10, 2017

J:\8135\1\00140721.DOCX

26

1956895/15878.0001