# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

GET BACK UP, INC.,

    Plaintiff,

v.                                                          Case No. 17-10068

CITY OF DETROIT & CITY OF DETROIT
BOARD OF ZONING APPEALS,

    Defendants.

_____/

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION AND SETTING STATUS CONFERENCE**

Pending before the court is Plaintiff's Motion for Preliminary Injunction and Permanent Injunction. (Dkt. #4.) After the motion was briefed by both sides, the court held a hearing on May 10, 2017. For the following reasons, the court will deny Plaintiff's motion.

## I. BACKGROUND

Plaintiff previously operated what it describes as "a residential substance abuse treatment facility in the City of Detroit, . . . serving approximately 40 residents." (Dkt. #1, Pg. ID 1.) It has struggled to maintain zoning approval from the community where it is located. This court has already had occasion to address allegations that the city had previously wrongly denied approval to operate in violation of the Americans with Disabilities Act ("ADA"), the Fair Housing Act, the Rehabilitation Act, and that the operative zoning provisions were unconstitutionally vague. *Get Back Up, Inc. v. City of Detroit*, No. 11-13909, 2013 WL 3305672, at *1 (E.D. Mich. July 1, 2013). After ruling

against Plaintiff, this court then denied a motion for reconsideration, *Get Back Up, Inc. v. City of Detroit*, No. 11-13909, 2013 WL 6729483, at *1 (E.D. Mich. Dec. 20, 2013), and the Sixth Circuit affirmed the decision, *Get Back Up, Inc. v. City of Detroit*, 606 F. App'x 792, 793 (6th Cir. 2015).

Plaintiff operated until August of 2015, then it submitted a request for a Conditional Use Permit, which the city granted. However, the Board of Zoning Appeals ("BZA") took up the issue following a formal appeal by a neighbor of the facility. After a hearing, the BZA reversed the grant of the permit citing a concern over property values, once more shuttering Plaintiff's facility.

Plaintiff now alleges that the BZA's decision was based upon prejudices related to stereotypes of people suffering from addiction, and that the ADA prohibits such discrimination against the disabled. It points both to a lack of any supporting evidence favoring the purported basis of the BZA's decision as well as statements made during the hearing that Plaintiff alleges are impermissibly discriminatory and influenced the BZA's decision. It requests that the court enter an order vacating the decision of the BZA and ordering the City of Detroit to issue a Conditional Use Permit consistent with that previously approved.

In response, Defendants argue that the requested relief should be denied, firstly, because it does not merely seek to maintain the status quo but instead asks the court to order the resumption of operations that have been suspended for nearly two years. They also contend that the BZA's decision, far from relying on impermissible stereotypes, was supported by evidence from testimony at the hearing describing various deleterious effects of the facility's operation on the surrounding residential area.

2

Defendants further contend that Plaintiff will not suffer any irreparable harm by the denial of the sought relief because numerous similar facilities populate the neighborhood and, in any case, the potential harm to side-stepping BZA's determination in this instance will outweigh it.

## II. STANDARD

In *Silverman v. Summers*, the Sixth Circuit described the rubric by which district courts should assess requests for preliminary injunction:

> The district court must consider and balance four factors in ruling on an application for a preliminary injunction: 1) whether the plaintiff has a strong likelihood of success on the merits; 2) whether the plaintiff would suffer irreparable injury in the absence of the injunction; 3) whether the injunction would cause substantial harm to others; and 4) whether the injunction would serve the public interest.

28 F. App'x 370, 372-73 (6th Cir. 2001) (citing *Sandison v. Michigan High School Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995)).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

In an earlier suit involving the same parties and issues but a different BZA hearing, this court framed its analysis as follows:

> Because the zoning ordinance is neutral and direct evidence of discrimination is absent, the shifting burdens of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), govern [Plaintiff]'s challenge to the BZA's decision. The analysis begins[] . . . with a search for evidence that the BZA denied [Plaintiff] a conditional-use permit at least in part from hostility toward the disabled. [Plaintiff]'s evidence of hostility is also, by sustained repetition, the main theme of [Plaintiff]'s papers—that the BZA based its decision on "myths and stereotypes" about recovering substance abusers. The best way to test this claim is to consider the evidence presented at the [relevant], BZA hearing and the zoning ordinance's command that a special use neither

3

>   diminish public safety nor "injur[e] . . . the use and enjoyment of [nearby] property."

*Get Back Up, Inc.,* 2013 WL 3305672, at *7 (citations omitted). As both parties agree that the *McDonnell Douglas* framework applies, the court will employ the same analysis here.[1] At the hearing, the parties also agreed that Plaintiff must show that a desire to discriminate against the disabled was a motivating factor in the BZA's decision. Plaintiff's counsel explained at the hearing that he would like the court to use a "filter" to remove impermissible statements and then determine whether the evidence that remained could have supported the BZA's decision.

Plaintiff points in particular to the testimony of six neighbors and statements by Board Member Weed for evidence that the BZA was motivated in part by impermissible animus toward addicts. A deeper review of the transcript shows most of Plaintiff's contentions to be little more than solicitous exaggeration. The court will address each cited example in turn bearing in mind the Sixth Circuit's holding that:

>   where the discrimination results from unfounded fears and stereotypes that merely because Plaintiff's potential clients are recovering drug addicts, they would necessarily attract increased drug activity and violent crime to the city, such discrimination violates the ADA and Rehabilitation Act.

*MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 342 (6th Cir. 2002).

---

[1]The court is unmoved by Defendants' argument that Plaintiff's request does not seek to maintain the current status quo. This argument proves too much. Taken seriously, it would essentially preclude all district court review of any permit denial by the BZA where the Plaintiff sought what could only be viewed as the natural remedy, an order compelling the issuance of a permit, or at the very least enjoining against the enforcement of the challenged zoning provision.

First, Plaintiff identifies the testimony of a neighbor who mentioned residents of Plaintiff's facility "coming out during the night" and argues that this evinces a prejudice. Exactly how this is tied to drug addiction is not explained. A more fulsome reading of the testimony shows that the neighbor had sought to show a video recording but was limited to her own description of its contents, which amounted to an individual entering her driveway and laying on the floor of the backseat of her inadvertently unlocked car during the night. (Dkt. #4-6, Pg. ID 254.) She further testified that, according to another neighbor, the same individual returned the next day, but walked off in the direction of the facility when he realized he was spotted. (*Id.*) Far from evincing a discriminatory motive based solely upon unfounded stereotypes, this testimony describes in detail a factual basis for serious concern about the impact that Plaintiff's facility would have on the safety of residents of the immediately surrounding community seemingly completely divorced of considerations of their disability.

Next, Plaintiff calls the court's attention to the testimony of a neighbor who stated that he did not want such a facility "in [his] front yard." Here again, the sentences directly following the complained-of statement explains the non-discriminatory meaning:

> I have watched people throw projections–projectiles, things–large things up to windows to guys and they throw things back down. But whatever they were throwing up, they could not take in the front door. . . . I'm three houses from that facility. I am one of the best witnesses that can stand up here today and tell you these things. . . . I'm concerned about the safety of my children and my neighbors. My neighbors across the street, the lady where the fence is on her yard, and her children have to run around that fence, because they can't play in front of their own yard.

(Dkt. #4-6, Pg. ID 254.) People throwing objects that are presumably contraband in and out of second story windows is uncontroversially a detriment to the community. This testimony is also not based on stereotype.

Plaintiff then turns to the testimony of a neighbor stating a concern about "hundreds and hundreds and hundreds and hundreds of drug addicts and possibly felons" relocating into the neighborhood. (Dkt. #4-6, Pg. ID 255.) Little further elaboration is given on this point besides a general anxiety regarding safety and property values. These comments display an impermissible bias, which, if served as a motivating factor in the BZA's decision, would likely support a claim of discrimination.

Another neighbor testified that when he was searching for a place to purchase a home around Detroit, he would have reconsidered purchasing a home where Plaintiff's facility was operating at full capacity with 160 participants. (Dkt. # 4-6, Pg. ID 257.) Plaintiff insists that this statement, absent empirical data "leav[es] the unmistakable conclusion that he was voicing a prejudice[,]" but this is not so. The neighbor's testimony is anecdotal evidence regarding the likely effect on property values. Even read as uncharitably as possible, this testimony would, at best, only very weakly suggest an impermissible stereotype. This could hardly be considered a motivating factor in the BZA's decision.

What Plaintiff calls the "most troubling reaction" came from another neighbor, whose testimony Plaintiff characterizes as expressing a "concern[] about having to 'look at' Get Back Up's residents." (Dkt. #13, Pg. ID 822.) Once more, Plaintiff is misinterpreting the testimony at the hearing:

> . . . I've seen them actually walking around the neighborhood. So for them to say that you're not operating and to see those kinds–to see the individuals coming out of those–coming out of that location, it caused concern for me and my family and the friends that I actually have coming around, because we're actually looking in the area to rebuild over there in that space so we having (sic) a concern with looking at those–with the individuals coming in and out of those locations.

(Dkt. # 4-6, Pg. ID 257.) That neighbor is describing an apparent inconsistency between his perception that individuals continue to flow in and out of the facility and claims that the facility is not operating but will instead soon be used for another purpose. Whatever the veracity of that perception, the statements do not provide strong evidence one way or another as to the presence of a discriminatory motive.

Finally Plaintiff suggests that a neighbor "expressed [a] vague, prejudiced concern about the 'quality of life' in the area." (Dkt. #13, Pg. ID 823.) Once more, Plaintiff's conclusory accusation that some statement is "prejudiced" is essentially question-begging. The neighbor centered his focus on the desire to maintain the "historic" quality of the neighborhood:

> So I stand with my elders. I stand with my community and I'm glad to be part of it. I'm in a third generation home. I've been affiliated with Russell Woods for 60 years. This is not part of the plan. . . .
>
> Please consider what this would do to the quality of life of the historic Russell Woods and we're talking not historic because we've got pretty houses. I'm talking historic because we have Brazil Dennard. I'm talking historic because we had Dudley Randall who was the father of the black arts movement. We had all of the Supremes, not one, all of them and the list goes on. Nicholas Hood sat up here as the only black man on the City Council during the riots. He lived in Russell Woods.
>
> So we're not only talking about the quality of life. We're talking about the legacy of our people and our growth in the City of Detroit and I think you should consider that very heavily.

7

(Dkt. # 4-6, Pg. ID 257-258.) The testimony suggests that the neighbor thought that the facility, originally zoned as a school, would be detrimental to the cultural impact of the community seemingly due to the opportunity cost of alternative site uses. This is also, at best, only weak evidence of a discriminatory intent.

The statements by Board Member Weed that Plaintiff relies upon, taken on their own, might suggest the presence of prejudice:

> . . . I think that there's a difference in the perspective of people who live in the community with respect to 160 individuals who've got a history, have a problem and have to deal with that as to whether or not that's right for them in the R-1 District.

(Dkt. # 4-6, Pg. ID 248.) On the one hand, his reference to the fact that the individuals have a "history" might be an allusion to their disability and attendant stereotypes, such as anti-social behavior. On the other hand, immediately subsequent statements suggest that his concern was also motivated by legitimate questions about the capability of the area to absorb concentrated housing that is not well-maintained.

> Well I drove by there on Saturday so I could at least know what I'm–be familiar with it and I would have to agree with the lady that there were debris. There was a mess.

(Dkt. # 4-6, Pg. ID 248.) Plaintiff has not offered any indication that this or any other testimony that the court has identified as arguably impermissible constituted a motivating factor in the BZA's decision, especially when compared against the plainly legitimate testimony.

Defendant, meanwhile, offers testimony from the BZA hearing by a real estate broker as a partial justification of the BZA's decision. She estimated that "[e]ach gentleman will probably have 60 to 70 square feet of personal space, which is similar to

8

the amount of personal space in a Federal institution." (Dkt. #4-6, Pg. ID 229.) She also described the contents of a study indicating that treatment facilities were associated with an "eight percent reduction in nearby home prices and that this discount is magnified for treatment centers that specifically treat opiate addictions as much as seventeen percent." (*Id.* at 230). This appears to be an accurate description of an article entered into the administrative record citing to a study using multiple listing service data. (Dkt. #12-2, Pg. ID 645.)

The cases upon which Plaintiff relies are inapposite, and, with the exception of *MX Group, Inc.*, are exclusively from outside of the Sixth Circuit. Also, all of the circuit court cases cited by Plaintiff merely upheld the district court's determination. In *MX Group, Inc.*, the board had evidently relied entirely on testimony regarding the hazards of methadone clinics generally as the plaintiff's clinic had not opened yet. 293 F.3d at 329. Thereafter, among other things, the city solicitor sent a letter to the Zoning Administrator stating that "a methadone clinic, such as Plaintiff's, was not a permitted use in any zone in the city." *Id.* at 330. Here neighbors supplied testimony, as described above, based on personal knowledge about hazards visited upon the community by the operation of Get Back Up, Inc., even at only a fraction of its total capacity. Additionally, nowhere is the suggestion made that Defendants had essentially foreclosed the possibility of similar facilities from opening within the community.

In *Pacific Shores Properties, LLC v. City of Newport Beach*, the city held a series of public meetings after a number of facilities opened in the community. 730 F.3d 1142, 1149 (9th Cir. 2013). At those meetings, residents "repeatedly described the persons in recovery as 'not true handicapped,' 'criminals,' 'gang members,' and 'druggies,' among

9

other derogatory terms[,]" culminating in permanent zoning ordinance changes that essentially rendered it impossible to own or operate such facilities in the community. *Id.* Here the record is far weaker on establishing animus, as several of the neighbors who testified explained that they viewed drug rehabilitation services to be a noble and admirable undertaking.

In *Innovative Health Systems, Inc., v. City of White Plains*, the court declined to disturb the district court's finding of a likelihood of success where the board gave no explanation for its decision following a hearing "replete with discriminatory comments about drug-and alcohol-dependent persons based on stereotypes and general, unsupported fears." 117 F.3d 37, 49 (2d Cir. 1997). That is simply not the situation here. As discussed *supra*, the record is hardly "replete with discriminatory comments." The BZA also issued a nine-page Decision and Order summarizing the testimony as well as explaining its findings and reasons for the decision. (Dkt. #4-9.)

That distinction also disposes of Plaintiff's reliance on *Step By Step, Inc. v. City of Ogdensburg*, which found that Plaintiff had established a likelihood of success on its claim for discrimination because:

> By completely failing to describe the reasoning and logic behind the denial of [plaintiff]'s application, the City Council has effectively created a black box where any justifications are a mystery. While at least a significant portion of the information placed into that box consisted of community opposition based upon impermissible discrimination, the City has asked for a ruling that the denial was free of any improper prejudices.
>
> The sequence of events, strong community opposition partially based upon improper generalizations concerning [plaintiff]'s mentally ill clients, and the City's failure to articulate any rationale for its denial sufficiently demonstrate that improper animus against the disabled individuals was a significant factor in the decision to deny plaintiff's application. As such, plaintiff has established a prima facie case of intentional discrimination.

10

176 F. Supp. 3d 112, 132-33 (N.D. N.Y. 2016). Here, among other things, the BZA at least referenced concerns, supported by testimony, over property values and aesthetics.

*Tsombanidis v. West Haven Fire Dept.*, involved a challenge to a fire code which resulted in a disparate impact on recovering addicts, was motivated by intentional discrimination, and failed to reasonably accommodate plaintiffs' handicap. 352 F.3d 565, 580 (2d Cir. 2003). The only applicable parallel to this case is the accusation of discrimination, which, in that case involved a history of hostility between residents and plaintiff. *Id.* Arguably that appears in this case as well, but this is hardly remarkable in cases involving zoning disputes. Importantly, *Tsombanidis* also involved uneven enforcement of the fire ordinance not normally applied against boarding houses along with statements by a city official expressing "personal dissatisfaction . . . and order[ing] [plaintiff] to evict the residents without any authority in the City Code." *Id.* No suggestion of uneven enforcement or lawless personal vindictiveness by individual city officials exists in this case.

The above cases offer little reason to depart from the determination that this court previously made regarding Defendants' zoning enforcement against Get Back Up, Inc., under very similar facts and upheld by the Sixth Circuit. Based on this record, Plaintiff has not shown a likelihood of success in establishing its prima facie case that a discriminatory purpose was a motivating factor in the BZA's decision.

**B. Other Factors**

The remaining factors do not weigh strongly in favor of an injunction either. Plaintiff will not suffer irreparable injury absent the requested relief, as it is free to use the land for some other permitted purpose, sell the land and seek to operate elsewhere, or, having perhaps made some adjustments to its operations to alleviate the concerns identified within the BZA's Decision and Order, once more make its case to the zoning authorities. Meanwhile, an injunction forcing the city to bless the operation of the facility may indeed cause substantial harm to others if property values were to fall in the community as a result. The public interest, if anything, weighs weakly against invalidating the findings of the BZA merely because some public comments by residents at the hearing are objectionable and discriminatory without reason to believe that they actually influenced the BZA's decision. The likely result would be to disincentivize potentially valuable participation by residents in such hearings.

Finally, the court will also deny the request for a permanent injunction for the same reasons that it will deny the request for a preliminary injunction. As the court cannot justify imposing a preliminary injunction at this point, it certainly will not impose the additional burden of a permanent one.

### C. Case Status

With this court having determined that neither preliminary nor permanent injunction is appropriate, it is unclear whether anything meaningful remains to be done in the case, especially as further discovery does not appear to be necessary. Despite Plaintiff's additional request for damages and any other appropriate relief within the complaint, the court has serious concerns about whether any issue remains for adjudication. "A federal court has no authority to render a decision upon moot questions

or to declare rules of law that cannot affect the matter at issue." *United States v. City of Detroit*, 401 F.3d 448, 450 (6th Cir. 2005) (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 530 (6th Cir. 2001)).

The court directs counsel for the parties to confer with one another to determine the suitability of a final order closing the case. **By June 16, 2017**, Plaintiff will file a joint memorandum no longer than seven pages long outlining the positions of the parties on this question and identifying, to the extent that they exist, any remaining issues for adjudication and any further necessary discovery. The court will hold a telephonic status conference to discuss the submission on **Monday, June 19, 2017 at 3:30 p.m.**

## IV. CONCLUSION

IT IS ORDERED that Plaintiff's Motion for Preliminary Injunction and Permanent Injunction (Dkt. #4) is DENIED.

IT IS FURTHER ORDERED that the parties are directed to confer to discuss the suitability of a final order. Plaintiff will file a memorandum outlining the pertinent considerations **by June 16, 2017.**

IT IS FURTHER ORDERED that the court will hold a telephonic status conference on on **Monday, June 19, 2017 at 3:30 p.m.. The court will initiate the call.**

                                           s/Robert H. Cleland  
                                           ROBERT H. CLELAND  
                                           UNITED STATES DISTRICT JUDGE

Dated: June 12, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 12, 2017, by electronic and/or ordinary mail.

                                                s/Lisa Wagner
                                                Case Manager and Deputy Clerk
                                                (810) 292-6522

S:\Cleland\JUDGE'S DESK\C2 ORDERS\17-10068.GETBACKUP.PreliminaryInjunction2.bss.wpd